IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROBERT CHARLES ANTHONY KING, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 1:23-cv-00730 |
| BRANDON DICKERSON and CALVIN PHILLIPS, | ) ) ) ) | |
| Defendants. | ) | |

<u>ORDER, MEMORANDUM OPINION, AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE</u>

This is a *pro se* civil rights action filed under 42 U.S.C. § 1983 by Plaintiff Robert Charles Anthony King ("Plaintiff"), a former pretrial detainee at the Alamance County Detention Center, against Detention Officers Brandon Dickerson and Calvin Phillips (collectively, "Defendants"). Before the Court is a Motion for Summary Judgment by Defendants [Doc. #61]; two Motions to Seal by Defendants [Doc. #63, #75]; two Motions to Strike by Defendants [Doc. #59, #79]; and a Motion [Doc. #84] by Plaintiff that the Court construes as Plaintiff's sur-reply to Defendants' Motion for Summary Judgment. For the reasons set out below, the Court recommends that Defendants' Motion for Summary Judgment be granted, and that the case be dismissed. In addition, the Court orders that Defendants' Motions to Seal are granted, Defendants' Motions to Strike are denied as moot, and Plaintiff's final filing be construed as his sur-reply and terminated to the extent it was docketed as a motion.

I.    PLAINTIFF'S CLAIMS AND PROCEDURAL BACKGROUND

Plaintiff's claims are set out in his Complaint [Doc. #2], which describes a use of force incident that occurred the morning of January 7, 2022, and names as defendants Brandon Dickerson ("Officer Dickerson") and Calvin Phillips ("Officer Phillips"), detention officers at Alamance County Detention Center ("ACDC"), where Plaintiff was held as a pretrial detainee. Specifically, Plaintiff alleges that Officers Dickerson and Phillips used excessive force in violation of the Fifth and Fourteenth Amendments by striking Plaintiff in the hand and knee to prevent Plaintiff from retrieving family pictures that were taken during a search of his cell, causing Plaintiff's hand to bruise and swell, and resulting in an injury to Plaintiff's right knee that required extended treatment and surgery.  (Compl. at 3, 5-8.)

On November 14, 2024, Defendants filed a Motion for Summary Judgment [Doc. #61].  On December 13, 2024, Plaintiff filed a document entitled "Plaintiff's Motion of Summary Judgment in Lieu of filing of Defendant's Motion to Strike Plaintiff's Expert Answer to Defendant's Motion for Summary Judgment" [Doc. #67], along with various supporting documents [Doc. #68 to Doc. #71].  It was unclear whether Plaintiff's Motion was a Response to Defendants' Motion for Summary Judgment or was instead Plaintiff's own motion for summary judgment; treating the Motion as a response in opposition to summary judgment, Defendants subsequently filed a Reply [Doc. #74], and treating the Motion as Plaintiff's motion for summary judgment, Defendants filed a Motion to Strike [Doc. #79] and a Response in Opposition [Doc. #81].  On January 31, 2025, Plaintiff filed a document entitled "Motion of 2nd response to Reply Memorandum of Law In Supporting of Motion Summary Judgment" [Doc. #84], in which he indicated that he had not yet moved for summary

judgment, and that his Motion filed on December 13 was intended only as a response to Defendants' Motion for Summary Judgment. In light of Plaintiff's clarification, the Court considers Plaintiff's December 13 Motion [Doc. #67] to be Plaintiff's response to Defendants' Motion for Summary Judgment, and construes Plaintiff's January 31 Motion to be a sur-reply to Defendants' reply as to their Motion for Summary Judgment.

## II. FACTS AND EVIDENCE

Because Defendants have moved for summary judgment, the facts below are set out in the light most favorable to Plaintiff. During the underlying events in January 2022, Plaintiff was a pretrial detainee at ACDC. (Fortner Decl., Doc. #65-6, ¶ 4.)[1] While at ACDC, Plaintiff was involved in numerous physical altercations with other inmates—by Plaintiff's own count, 117 different fights with other inmates—and was often verbally and physically aggressive with detention officers, screaming threats and profanities in officers' faces. (Pl. Dep., Doc. #65-2 at 12, 14; Fortner Decl., Doc. #65-6, ¶ 4; McClure Decl., Doc. #65-8, ¶ 8; Young Decl., Doc. #65-7, ¶ 9.) Due to Plaintiff's aggression towards other detainees and detention officers, Plaintiff was considered a security risk, and detention officers were required to use caution during their interactions with Plaintiff. (Young Decl., Doc. #65-7, ¶ 11-12; McClure Decl., Doc. #65-8, ¶ 9.)

Plaintiff is deaf, and he communicates with others using sign language, or by writing back and forth on a notepad or by text, and he can lip-read with 75 to 80 percent accuracy and can speak. (Pl. Dep., Doc. #65-2 at 3, 9.) While he was detained at ACDC, Plaintiff usually

---

[1] For ease of reference, cited page numbers will refer to the sequential numbers generated by the Court's Electronic Case Filing ("ECF") system.

3

communicated with detention officers through lipreading and writing notes on a notepad. (Pl. Dep., Doc. #65-2 at 9.) However, lipreading could be challenging, particularly in circumstances where an officer's facial hair covered their mouth or lips, when multiple people were talking at once, and, given that Plaintiff was detained during the height of the COVID-19 pandemic, when officers wore face masks. (Pl. Dep., Doc. #65-2 at 9-10.)

Plaintiff was familiar with, and read, ACDC's Jail Facility Handbook, which governed detainees' conduct at ACDC. (Pl. Dep., Doc. #65-2 at 10-11; Young Decl., Doc. #65-7, ¶ 8.) He was aware that detainees were prohibited from keeping more than six pictures in their cell, from tampering with or covering the lights in their cell with any obstructions, from hanging pictures on the walls in their cell, and from "misusing" toothpaste. (Handbook, Doc. #65-6 at 416, 430; Pl. Dep., Doc. #65-2 at 11.)

On January 6, 2022, Sergeant Sherman Summers observed dozens of pictures stuck to the lights, walls, and ceiling in Plaintiff's cell with toothpaste. (Fortner Decl., Doc. #65-6, ¶ 5; Pl. Dep., Doc. #65-2 at 13; Phillips Decl., Doc. #65-9 Ex. A.)[2] According to ACDC records, Sergeant Summers repeatedly directed Plaintiff to remove the pictures, but Plaintiff refused. (Fortner Decl., Doc. #65-6, ¶ 5-6.) In his Response, Plaintiff states that he had the "right to refuse or consent to labor" and they did not offer him wages or gaintime. (Pl. Resp., Doc. #67 at 7.) Plaintiff also states that he had the "right to stand his grounds." (Pl. Resp., Doc. #67 at 7.)

---

[2] In an attachment to his response, Plaintiff references 33 family pictures that were taken from his cell. (Pl. Resp., Doc. #67 at 13.)

The following morning, January 7, Lieutenant Tiffany McClure[3] met with Detention

Officers Phillips, Dickerson,[4] Erika Blechert, and Marcus Moore, and informed them that they

would be directing Plaintiff to remove the pictures from the lights, walls, and ceiling of his

cell. If Plaintiff refused, the team would remove the pictures for him. (McClure Decl., Doc.

#65-8, ¶¶ 10-11.) At approximately 11:30 a.m., Lieutenant McClure and her team arrived at

Plaintiff's cell with a round trash barrel. (McClure Decl., Doc. #65-8, ¶ 11.) Upon arriving at

Plaintiff's cell, Lieutenant McClure directed Plaintiff to remove the pictures from the lights

and walls and ceiling. (McClure Decl., Doc. #65-8, ¶ 11.) Plaintiff refused. By Plaintiff's

account, he challenged the officers, saying "You can't do that." (Pl. Dep., Doc. #62-2 at 14.)

Lieutenant McClure then directed Plaintiff to exit his cell so that the detention officers could

remove the pictures. (McClure Decl., Doc. #65-8, ¶ 14.) Plaintiff refused, stating that he

wanted to "stand and watch," (Pl. Dep., Doc. #65-2 at 16), and indicated to Lieutenant

McClure that she would have to "make him" leave the cell (McClure Decl., Doc. #65-8, ¶ 15).

After refusing several direct orders to leave, Plaintiff finally exited his cell but continued to

_____

[3] Lieutenant McClure has been promoted to Captain and now uses the surname "Smith." (McClure Decl., Doc. #65-8, ¶¶ 2-3.) Because the record evidence refers to Lieutenant McClure by her former rank and name, the Court will do the same when discussing the evidence.

[4] Plaintiff alleged in his Complaint and asserted throughout his briefing that Officers Phillips and Dickerson were "maintenance men" with ACDC. (Compl. at 2, 5; see Pl. Resp., Doc. #67 at 4.) As evidence, Plaintiff points only to the video footage submitted by Plaintiff and discussed in more detail *infra* reflecting that several officers, presumably Officers Phillips and Dickeson, were dressed in non-uniform pants, with an ACDC shirt. (Pl. Resp., Doc. #67 at 4-5.) However, Officers Phillips and Dickerson have submitted sworn affidavits confirming that they are detention officers at ACDC, with responsibility for maintaining safety and security at ACDC for inmates, staff, and the public, and eliminating the introduction of contraband at ACDC. (Phillips Decl., Doc. #65-9, ¶¶ 2-3; Dickerson Decl., Doc. #65-10, ¶¶ 2-3.) Lieutenant McClure, a supervising officer at ACDC, also identifies Officer Dickerson and Officer Phillips as detention officers who were part of her platoon. (McClure Decl., Doc. #65-8, ¶ 11.) Plaintiff has not presented any evidence to establish that they are not detention officers or to create a genuine issue of material fact regarding the status of Officer Dickerson and Officer Phillips as detention officers.

"verbally challenge" the detention officers, (Pl. Dep., Doc. #65-2 at 14), shouting profanities and making physical threats (McClure Decl., Doc. #65-8, ¶ 17). Because Plaintiff continued to shout profanities and make physical threats towards detention officers after exiting the cell, detention officers positioned themselves between Plaintiff and the cell doorway to prevent him from reentering the cell. (McClure Decl., Doc. #65-8, ¶ 18.)

With Plaintiff outside the cell, Lieutenant McClure directed Officers Phillips and Dickerson to remove the pictures from the walls and ceiling. (McClure Decl., Doc. #65-8, ¶ 21.) Because Plaintiff's pictures were adhered to the wall using toothpaste and had been converted into wall and ceiling hangings, Lieutenant McClure determined that they had been altered from their original state and were thus considered contraband subject to disposal. Lieutenant McClure directed Officers Phillips and Dickerson to dispose of the pictures in the trash barrel. (McClure Decl., Doc. #65-8, ¶¶ 20-21; Handbook, Doc. #65-6 at 415.) As Officers Phillips and Dickerson removed the pictures from the walls and placed them in the trash barrel, Plaintiff became increasingly aggressive and began to yell threats that he would get his pictures back "one way or the other" even if he had to "beat every one" of the officers, and stated that when the detention officers exited the cell and passed by him with the trash barrel, he was going to do "whatever [he] had to" do to get the pictures back. (McClure Decl., Doc. #65-8, ¶ 22.) Plaintiff agrees that he was angry, that "if they're rude to me, I'm rude back," that he "challenged" them, and that he was "frustrated" and "loud" and "cussing." (Pl. Dep., Doc. #65-2, at 14, 15.)[5]

---

[5] During his deposition, Plaintiff explained that he suffered a traumatic brain injury while putting up a fence in 2015 or 2016, which resulted in some changes in his behavior including "anger issues, frustration, stress," and he noted that medications made his anger and emotional control issues worse. (Pl. Dep., Doc. #65-2 at 7-8.)

6

After Officers Dickerson and Phillips finished removing the pictures from the walls and ceiling, they exited Plaintiff's cell, followed by Lieutenant McClure with the trash barrel. (McClure Decl., Doc. #65-8, ¶ 26.) At this point, Plaintiff broke through the barrier of officers that surrounded his cell and quickly moved towards the trash barrel. Plaintiff contends that "no one said anything [to him] at all," and that he did not "hear or see anything," such as officers ordering him to stop. (Pl. Dep., Doc. #65-2 at 17.) Plaintiff grabbed the side of the trash barrel with both hands, and then put one hand in to grab the pictures (Pl. Dep., Doc. #65-2 at 17-18), and Officer Phillips and Lieutenant McClure ordered Plaintiff to let go, (McClure Decl., Doc. #65-8, ¶ 29), which Plaintiff contends he could not hear (Pl. Dep., Doc. #65-2 at 15, 17). To get Plaintiff to let go, Officer Phillips administered three quick strikes to Plaintiff's hand.[6] (McClure Decl., Doc. #65-8, ¶ 30; see Pl. Dep., Doc. #65-2 at 17.) Plaintiff briefly let go of the trash barrel with one hand, but he kept one hand on the barrel, and "cussed [the officer] out," yelling, "Is that all you got, is that all you got? I'll f*** you up!" (McClure Decl., Doc. #65-8, ¶ 31; Pl. Dep., Doc. #65-2 at 17-18.) According to Lieutenant McClure, officers again ordered Plaintiff to let go of the trash barrel, and Plaintiff again refused. (McClure Decl., Doc. #65-8, ¶¶ 34-36.) Plaintiff agrees that at that point, Officer Phillips was trying to prevent Plaintiff from getting the pictures, and all the officers knew what was going on because Plaintiff was "screaming." (Pl. Dep., Doc. #65-2 at 17.) Plaintiff agrees that he was angry and that after Officer Phillips hit his hand, Plaintiff said, "is that – what the f***

---

[6] Plaintiff disputes where Officer Phillips struck Plaintiff, contending that Officer Phillips "hit my hand, not my arm, my hand." (Pl. Dep., Doc. #65-2 at 15, 17.) Officer Phillips states that he struck Plaintiff's radial nerve in an effort to get Plaintiff to let go of the trash can. (Phillips Decl., Doc. #65-9, ¶ 17.) Whether Officer Phillips struck Plaintiff's hand versus his arm is not material to this Court's decision.

you got or something like that." (Pl. Dep., Doc. #65-2 at 18). Plaintiff also agrees that after

Officer Phillips hit him in the hand, he knew that Officer Phillips wanted him to back away

from the trash can. (Pl. Dep., Doc. #65-2 at 18.) Plaintiff also agrees that he nevertheless

continued to hold onto the trash barrel for "balance." (Pl. Dep., Doc. #65-2 at 18.) Officer

Dickerson, in another attempt to get Plaintiff to let go of the trash barrel, placed his right hand

on Plaintiff's right forearm and executed a foot sweep to take Plaintiff to the ground.

(McClure Decl., Doc. #65-8, ¶ 37.) Plaintiff describes this as being kicked in the back of the

leg, and later that day explained to medical providers that his "leg was locked and he was

pushed to the floor" and "heard a pop." (Medical Records, Doc. #68 at 78.) Once Plaintiff

was on the ground, the use of force ceased, and Lieutenant McClure instructed Plaintiff not

to move and radioed for medical assistance. (McClure Decl., Doc. #65-8, ¶ 41.) A nurse

arrived on scene, examined Plaintiff's right leg, and escorted Plaintiff to the medical office in

a wheelchair for further evaluation. (McClure Decl., Doc. #65-8, ¶¶ 42-43; Medical Records,

Doc. #68 at 78.)

     In his response to Defendants' Motion for Summary Judgment, Plaintiff largely does

not dispute Defendants' description of the use-of-force incident. Plaintiff only contends that

the responding officers wore face masks during the duration of the altercation, which made it

hard for Plaintiff to understand what they were saying or ordering him to do,[7] and that the

injuries Plaintiff suffered to his hand and right knee are more significant than Defendants

---

[7] At his deposition, Plaintiff conceded that there were "maybe one or two [detention officers] that were respectful enough to remove their mask or lower their masks so I could read their lips," at least when they first came into his cell. (Pl. Dep., Doc. #62-5 at 14.)

contend. Notably, Plaintiff does not dispute Defendants' evidence that Plaintiff repeatedly failed to comply with orders and was verbally and physically aggressive towards detention officers throughout the incident.

Plaintiff also submitted video footage of the Q-Block common area on the morning of January 7, 2022. The video shows that at approximately 11:35 on January 7, a group of detention officers, presumably Lieutenant McClure and her team, entered the cell block with a trash barrel. (Video, 11:34:22-33.)[8] As they entered the block, all of the officers were wearing face masks. The group proceeded to a cell, presumably Plaintiff's, and opened the door. Several seconds later, Plaintiff's cellmate exited the cell and sat at a table in the common area, where he remained for the duration of the events. (Video, 11:35:02.) Plaintiff exited the cell approximately 40 seconds later and sat on top of the same table outside the cell. (Video, 11:35:42.) Plaintiff remained at the table for approximately two minutes, at which point he jumped off the table and moved swiftly towards the open door to his cell, where a guard standing outside prevented him from entering. (Video, 11:37:17.) At this point, three other guards responded to Plaintiff's cell and positioned themselves between Plaintiff and the cell door, presumably to prevent him from entering. (Video, 11:37:28-45.) For approximately the next ten minutes, Plaintiff remained standing in the common area outside his cell, appearing to converse with the officers, often face to face at a close distance, pointing at officers and raising his hands over his head, and drawing the attention of several additional detention

---

[8] Footage from the camera is assigned an exhibit number in Plaintiff's Response Brief and thus has a corresponding exhibit "page" on the docket [Doc. #67-2]. That exhibit was provided to the Court via flash drive. The flash drive has two files, each of which contains footage from the same camera on the same date. The first file includes footage from 11:34 to 11:49 a.m., and the second file includes footage from 11:49 to 11:57 a.m. When citing to the video footage, the Court will reference the timestamp on the video.

officers and other inmates who were also in the common area walking around and watching the incident unfold. (Video, 11:37:45-11:47:56.) A few seconds before 11:48, Plaintiff appeared to walk through a group of officers towards his cell door. (Video, 11:47:56.) Due to the distance between the camera and Plaintiff's cell, and the location of Plaintiff's cell behind a staircase, the ensuing altercation is nearly impossible to see. (Video, 11:47:56-11:49:12.) The video only depicts a cluster of detention officers, presumably with Plaintiff somewhere in the midst. About 20 seconds later, an individual standing inside the entrance to Plaintiff's cell appears to place his or her arm on another individual, raise their leg, and appears to use their knee to strike the other individual in the knee, causing the other individual to fall to the ground. (Video, 11:48:16-18.) While this altercation was presumably Officer Dickerson's foot sweep movement, the video quality is such that none of the individuals are identifiable. After the individual was subdued, detention officers remained outside Plaintiff's cell for several minutes, and at 11:53, a nurse entered the cellblock and proceeded towards Plaintiff's cell. (Video, 11:53:05-15.) Several minutes later, the nurse left (Video, 11:55:33-35) and returned with a wheelchair (Video, 11:56:57). Plaintiff was taken out of the cellblock in the wheelchair at 11:57, bracing his right knee with his hands. (Video, 11:57:43-49.)

Plaintiff also submitted copies of his medical records to support his allegations that Officer Dickerson's use of force caused an injury that ultimately required surgery. According to these records, immediately following the use-of-force incident on January 7, Plaintiff was seen by medical staff. During the exam, he indicated that his leg was locked and that he was pushed to the floor and heard a "pop", that he was experiencing pain in his right leg from his hip to his ankle, and that he was unable to extend his right leg. (Medical Records, Doc. #68

10

at 78.) Plaintiff was prescribed Ibuprofen for the pain, and x-rays of Plaintiff's right knee were ordered, which were negative for fracture and dislocation. (Medical Records, Doc. #68-1 at 34, 47.) Following continued complaints of lower-leg pain, Plaintiff was seen by medical staff again two days later on January 9, 2022. (Medical Records, Doc. #68 at 77-78.) At this visit, Plaintiff's lower right leg was visibly swollen, and medical staff ordered x-rays of Plaintiff's tibia and fibula (Medical Records, Doc. #68 at 77-78), which revealed "no dislocation" but "suspect unchanged chronic lateral tibial plateau avulsion fracture" (Medical Records, Doc. #68-1 at 32). Plaintiff was prescribed Mobic for the pain. (Medical Records, Doc. #68 at 77-78.) During the weeks following the January 7 incident, Plaintiff periodically followed up with medical staff complaining of right knee pain and swelling. (Medical Records, Doc. #68 at 76; see e.g., Doc. #68-1 at 8-10, 15-16, 18-19, 26, 28.) At some point, Plaintiff was provided with crutches and a knee brace. (See Medical Records, Doc. #68 at 76.) Progress notes from a visit on March 24, 2022 indicate that the pain and swelling had improved since January but that his knee would "give[] out" at times, and noted slight edema and tenderness. (Medical Records, Doc. #68 at 76.) On April 8, 2022, Plaintiff had an MRI of his right knee, which revealed that Plaintiff had a "right ACL tear, medial meniscus tear, and lateral meniscus tear." (Medical Records, Doc. #68 at 98, 105, #68-1 at 1.) Plaintiff underwent surgery on May 9, 2022, to repair the knee injuries. (Medical Records, Doc. #69-6 at 43-65.)

## III.  SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine

11

issue of material fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

As noted above, Plaintiff has submitted video evidence in his opposition to Defendants' Motion for Summary Judgment. Video evidence presents an "added wrinkle" on summary judgment. Scott v. Harris, 550 U.S. 372, 378, 380 (2007) (internal citations omitted). In a typical case, defendants often rely on video evidence to support summary judgment, and "when a video quite clearly contradicts the version of the story told by the plaintiff . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." Simmons v. Whitaker, 106 F.4th 379, 385 (4th Cir. 2024) (internal quotations and brackets omitted); Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011). However, when a video "does not blatantly contradict" the non-moving party's account of the facts, it "must be taken in the light most favorable to [the non-moving party] at summary judgment." Simmons, 106 F.4th at 385-86 (citing Scott, 550 U.S. at 378-80).

12

B. <u>Discussion</u>

Plaintiff brings a § 1983 claim against Defendants for excessive force in violation of his Fifth and Fourteenth Amendment rights.[9]  In order to state a claim under 42 U.S.C. § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).  Applicable here, the Fourteenth Amendment Due Process Clause "protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" <u>Short v. Hartman</u>, 87 F.4th 593, 608-09 (4th Cir. 2023) (quoting <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 398 (2015)); <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee.").  In <u>Kingsley</u>, "[t]he Supreme Court provided a non-exhaustive list of factors courts must use to determine objective reasonableness:

> [1] [T]he relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

---

[9] In Response to Defendants' Motion for Summary Judgment, Plaintiff additionally contends that Defendants' actions on January 7 were taken in retaliation for Plaintiff filing a § 1983 lawsuit against ACDC and its employees, and that Defendants' actions were a result of bias against Plaintiff based on his prior suit. (Pl. Resp., Doc. #67 at 13.)  However, there is no record of Plaintiff filing a § 1983 action against ACDC or its staff prior to January 7.  (See Clerk's Letter, Doc. #84-1).  Moreover, no such claims were raised in the Complaint in this case, and Plaintiff has not moved to amend to add any such claims.

13

Simmons v. Whitaker, 106 F.4th 379, 387 (4th Cir. 2024) (quoting Kingsley, 576 U.S. at 397). In addition, a court must consider the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained," including the "policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Kingsley, 576 U.S. at 397 (citation and internal brackets omitted). Objective reasonableness must be assessed "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id.; Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (noting that when a court considers the reasonableness of the officer's actions, the court must consider the "facts at the moment that the challenged force was employed").

Here, Defendants contend that their actions were related to a legitimate nonpunitive interest in preserving safety and security at ACDC, and that their use of force was objectively reasonable. (Defs.' Br., Doc. #65 at 16-23.)

Turning to the first Kingsley factor, the relationship between the need for the use of force and the amount of force used, Defendants contend that the amount of force used was proportional given Plaintiff's repeated lack of compliance with legitimate directives, his attempts to physically intercept officers, and his repeated threats and escalating violent behavior. (Defs.' Br., Doc. #65 at 17-18.) The Court agrees. The undisputed evidence indicates that Plaintiff was classified as a security risk with, by his own admission, over 100 physical fights with other inmates (Pl. Dep., Doc. #65-2 at 12)[10] and a history of arguments

---

[10] As Plaintiff explained in his deposition:

    Q. How many times in total were you involved in violence in the jail?
    A. Meaning?

and conflicts with correctional officers. (Pl. Dep., Doc. #65-2 at 14.)[11] The undisputed evidence further reflects that from the moment the officers entered his cell, Plaintiff disobeyed direct orders from officers to remove the pictures and to exit the cell, and instead "challenged" the officers, told them "you can't do that," (Pl. Dep., Doc. #65-2 at 14), and did not immediately exit even though he understood that he was supposed to step back when officers were searching his cell to let them do their job (Pl. Dep., Doc. #65-2 at 11). When Plaintiff finally exited the cell, he continued to "verbally challenge" the officers by shouting profanities and making threats. (Pl. Dep., Doc. #65-2 at 14; McClure Decl., Doc. #65-8, ¶¶ 15, 17.) Even assuming, as Plaintiff contends, that he could not hear or understand the officers' orders to remove the pictures from the wall, Plaintiff admitted in deposition that the officers "asked [him] to leave the cell with the other guy in the cell," (Pl. Dep., Doc. #65-2 at 16), and Plaintiff

---

Q. A fight, having a shank, anything like that.
A. Yes, I – I did have that on me.
. . . .
Q. So how many fights were you involved in?
A. 117
Q. 117 different fights? And how many different times did you use bottles full of fecal matter in those fights?
A. One, because the other two inmates, they had a weapon – a real weapon, and I had no choice but to defend myself.
(Pl. Dep., Doc. #65-2 at 12.)

[11] As Plaintiff explained in his deposition:
Q. But you're aware that you're not allowed to have things hanging from the ceilings?
A. I was making a picture, because I moved from another cell and was – the only picture I had up there on the ceiling in front of the vent to dry a toothpick – or toothpaste with it, and they never bothered to – I became an asshole, because I was fighting for my freedom.
Q. Against the correctional officers?
A. If you know how they run the place, I wish the FBI would get involved.
Q. So you had to fight for yourself?
A. Yes.
Q. Like with the officers?
A. Thers was a lot of arguments, yes, conflicts, because – because they wanted to force me to do things, and I would try to force them to do their job. I'm not playing. I'm not going to sit back and say, okay, okay. I will challenge.
(Pl. Dep., Doc. #65-2 at 14.)

knew that when an officer was searching his cell, he was supposed to "[s]tep back and let them do their job" (Pl. Dep., Doc. #65-2 at 11).[12]

Plaintiff's aggressive behavior did not cease once he exited the cell. As Defendants removed the pictures from Plaintiff's wall and ceiling, Plaintiff continued to yell threats. Plaintiff agrees that he was angry, that he "challenged" them, and that he was "frustrated" and "loud" and "cussing." (Pl. Dep., Doc. #65-2 at 14, 15.) When Defendants emerged from Plaintiff's cell with the trash barrel, Plaintiff broke through a barrier of detention officers that had positioned themselves to prevent Plaintiff from re-entering his cell, and Plaintiff grabbed onto the side of the trash barrel. Plaintiff admits that he walked toward the trash barrel and reached in to get the pictures. (Pl. Dep., Doc. #65-2 at 17.) Officers ordered Plaintiff to let go of the trash barrel, and although Plaintiff again argues that he did not hear these orders, it appears that it would have been apparent to Plaintiff based on context—Plaintiff had just barreled through a line of guards preventing Plaintiff from reaching the very item he grabbed—that he would not have been permitted to grab the trash barrel and retrieve the pictures. Indeed, Plaintiff admits that officers were trying to prevent him from getting the pictures, that he was angry and frustrated and "screaming", and that he was reaching in the trash can to retrieve the pictures that officers had placed there. (Pl. Dep., Doc. #65-2 at 17.)

---

[12] In addition, the Court notes that in his deposition, Plaintiff testified that there had been an earlier search, in which the pictures were not taken, and with respect to the second search at issue here:

> Q. [W]hen the officers came to your cell, they told you to take those items down?
> A. On the second time.

(Pl. Dep., Doc. #65-2 at 14.) Plaintiff also stated in his response brief that he did not take the pictures down earlier when asked to because he has the "right to refuse or consent to labor" and officers did not offer him wages or gaintime. (Pl. Resp., Doc. #67 at 7.) Plaintiff also states that he has the "right to stand his grounds." (Pl. Resp., Doc. #67 at 7.) Thus, by Plaintiff's own testimony it appears that Plaintiff was aware that he had been instructed to take the pictures down. Moreover, it clearly became apparent officers were taking down the pictures, and Plaintiff did not then acquiesce, but instead testified that he "challenged" the officers, as discussed above.

In the circumstances, Officer Phillips' strikes to Plaintiff's right hand were justified in light of Plaintiff's repeated noncompliance and escalating behavior, and were proportional to his legitimate efforts to get Plaintiff to let go of the trash barrel and the pictures, which were considered contraband. Even after Officer Phillips struck Plaintiff's hand, Plaintiff still continued to hold onto the trash barrel and "cussed [Officer Phillips] out" and said, "Is that all you got? I'll f*** you up!" or "[I]s that – what the f*** you got or something like that." (Pl. Dep., Doc. #65-2 at 17-18; McClure Decl., Doc. #65-8, ¶ 31.)[13] When Officer Phillips' use of force was still insufficient to secure Plaintiff's compliance, Officer Dickerson's foot sweep maneuver was both necessary and proportional to bring Plaintiff to the ground and into compliance. In sum, given Plaintiff's ongoing belligerence, repeated refusal to obey orders, and the clear threat he posed to officers and potentially to other inmates on the block, Defendants' use of force was reasonable and proportional.[14] See Belton v. Fields, No. 1:23CV169, 2025 WL 1455814, at *19 (M.D.N.C. May 21, 2025).

The second Kingsley factor, the extent of Plaintiff's injury, is a closer call. Plaintiff alleges that Defendants' use of force caused his right hand to swell and bruise, and resulted in serious injury to his knee, which caused significant swelling and bruising and ultimately

---

[13] In an earlier filing, Plaintiff explained that after the officer struck his hand, Plaintiff responded by saying "What the f***! Is that all you got? F*** you I'm getting my sh*t." (Pl. Motion, Doc. #19 at 9.)

[14] Defendants' use of force also appears to have complied with ACDC's use of force policy, which permits the use of force through a "control hold," such as when an officer uses "planned kicks and blows to non-vital areas of the inmates/detainees [sic] body to take down the inmate/detainee" to gain compliance. (Policy Manual, Doc. #65-6 at 279-80.) Officers Phillips and Dickerson both utilized control holds, striking Plaintiff's hand and knee, two non-vital areas, in an effort to regain Plaintiff's compliance. See Williams v. Benjamin, 77 F.3d 756, 766 (4th Cir. 1996) (compliance with prison policy provides "powerful evidence that the application of force was tempered and that the officers acted in good faith").

17

required surgery. (Compl. at 7.)[15] The Court notes, however, that a torn ACL is not an expected or anticipated injury from the force used to bring Plaintiff down; indeed, sweeping a detainee's leg to bring them to the ground and into compliance is a common procedure, see, e.g., Griffin v. Hardrick, 604 F.3d 949, 955 (6th Cir. 2010); Monroe v. Riverside Reg'l Jail, No. 1:21cv524, 2022 WL 433130, at *9 (E.D. Va. Feb. 11, 2022), and the extent of Plaintiff's injury appears largely due to the unfortunate way he fell onto his knee, rather than a natural result of the force used. Thus, the extent of Plaintiff's injury does not necessarily reflect the extent of the force used, making this factor a closer call. See Griffin, 604 F.3d at 952, 955 (finding that defendant detention officer's use of a leg-sweep maneuver was not wanton or excessive where another officer "accidentally fell on [plaintiff]'s leg as a result of the leg sweep," which resulted in plaintiff breaking her tibia and needing "surgery, eight screws, and a metal plate to fix" the injury). Nevertheless, given the extent of Plaintiff's knee injury, the Court will treat the second Kingsley factor as weighing in Plaintiff's favor.

The third Kingsley factor, effort to temper or limit the amount of force, weighs in Defendants' favor. As described above, Defendants repeatedly tried to de-escalate the situation prior to administering force by issuing verbal commands and increasing officer presence in the cell block and around the cell, but Plaintiff remained combative and

---

[15] Plaintiff's medical records do not indicate that Plaintiff suffered any significant injury to his hand during the January 7 incident, or that he subsequently sought treatment for a hand injury, so the Court focuses here on Plaintiff's allegations regarding his knee.

Defendants contend that expert testimony would be required to establish causation. However, expert testimony is not necessarily required. See Kopf v. Skyrm, 993 F.2d 374, 378-79 (4th Cir. 1993). Particularly given Plaintiff's *pro se* status, the Court would not intend to resolve this second Kingsley factor based on a lack of expert testimony. The Court instead assumes that the injury on January 7 caused the torn ACL that was discovered 3 months later and resulted in subsequent surgery in May.

18

disobedient. See Belton, 2025 WL 1455814, at *20. Further, as noted above, even after Officer Phillips' hand strikes, Plaintiff continued to hold onto the trash barrel and yell profanities and threats at officers, leading to the need for additional efforts to bring Plaintiff under control. The subsequent foot-sweep maneuver finally brought Plaintiff into submission, and it is undisputed that after that maneuver brought Plaintiff to the ground, no additional force was used.

The fourth and fifth Kingsley factors, the severity of the security problem at issue and the threat reasonably perceived by the officers, also weigh in Defendants' favor. Plaintiff's status as a security risk because of his history of aggression towards officers and other detainees required officers to use caution when engaging with Plaintiff, and increased the severity of the potential threat that the officers faced. In addition, as described above, Plaintiff grew increasingly aggressive and hostile, and physically and verbally threatened the officers while other detainees walked around the area. In light of these facts, it was objectively reasonable for Defendants to perceive that Plaintiff's behavior constituted a security threat, and that given Plaintiff's violent history, he might plausibly carry out his threats of violence. Belton, 2025 WL 1455814, at *20 (quoting Wilson v. Laureano, No. 3:22CV692, 2024 WL 1683616, at *11 (E.D. Va. Apr. 18, 2024)) (finding that the fourth and fifth Kingsley factors weighed in defendant's favor where plaintiff was a known security risk and repeatedly threatened to fight defendant and refused to follow his orders). These factors weigh in Defendants' favor.

Finally, the sixth Kingsley factor, whether Plaintiff was actively resisting, also favors Defendants. As described at length above, the evidence indicates that Plaintiff did not

passively refuse to comply; instead, Plaintiff by his own account, challenged officers, did not leave the cell as directed, continued to verbally challenge the officers loudly with profanities and threats, charged through a group of officers towards a barrel of contraband, removed items that he knew they were trying to prevent him from getting, and even after being struck in the hand still continued to grab the barrel and yell threats and profanities at officers. See Belton, 2025 WL 1455814, at *20; Terry v. Jarrell, No. 3:22CV774, 2023 WL 2588456, at *6 (E.D. Va. Mar. 21, 2023).

The video evidence of the incident that Plaintiff submitted does not create a genuine issue of material fact, given the undisputed facts included in Plaintiff's deposition. The video footage does not include any audio, does not show the inside of Plaintiff's cell, and, due to the location of the camera, does not show much of the area outside of Plaintiff's cell because it is largely obscured by a staircase. As a result, the video does not clearly depict the events giving rise to the use of force, nor the actual incident. To the limited extent that the events are captured, the footage appears to support Defendants' version of events: while Plaintiff is visible, he is shown moving his arms above his head, attempting to re-enter his cell, and charging towards the trash barrel. The Court does not use the video to reject or contradict Plaintiff's version of events, Simmons, 106 F.4th at 385-86, but viewing the video in the light most favorable to Plaintiff, it does not create an issue of fact that would preclude summary judgment in light of the undisputed evidence discussed above.

In sum, five of the six Kingsley factors weigh in Defendants' favor. The undisputed evidence indicates that Defendants' use of force was related to a legitimate nonpunitive interest in regaining order, and that the force applied was objectively reasonable in the

circumstances.[16]  See Stewardson v. Titus, 126 F.4th 1264, 1275-77 (7th Cir. 2025); McCroden v. Cnty. of Volusia, 724 F. App'x 768, 771-72 (11th Cir. 2018); Shafer v. Toman, No. 5:21CV14, 2022 WL 4134774, at *5 (W.D. Va. Sept. 12, 2022); Mills v. Rich, No. 7:13CV138, 2015 WL 5139198, at *4-5 (E.D.N.C. Sept. 1, 2015).  Plaintiff's claims against Defendants should be dismissed.

Moreover, even if there were a genuine issue of material fact regarding the use of force, the Court also concludes that Defendants would be entitled to qualified immunity in this circumstance.  Qualified immunity shields government officials from liability unless "the official violated a statutory or constitutional right" and "the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. Al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  A right is clearly established when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft, 563 U.S. at 741 (quotations and brackets omitted).  Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Id. at 743.  In this case, Plaintiff has not established a constitutional violation under the Fourteenth Amendment, nor has he established that every reasonable official would have understood that the actions

---

[16] Plaintiff argues that because he was issued a disciplinary ticket for a "minor infraction," Defendants' use of force was objectively unreasonable.  (Pl. Resp., Doc. #67 at 10-11; Disciplinary Ticket, Doc. #70-9 at 1-2.)  However, the fact that Plaintiff's disciplinary proceeding classified the infraction as "minor" is not, as Defendants correctly argue, per se evidence that the use of force was objectively unreasonable.  As described at length above, Plaintiff's behavior posed clear threats to jail security and the safety of the officers and other inmates in the cell block, and Defendants' assessment of the threat that Plaintiff posed and the subsequent use of force deployed was reasonable to gain Plaintiff's compliance, regardless of the level of discipline Plaintiff subsequently received.  See Kingsley, 576 U.S. at 397 (directing that objective reasonableness be assessed "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight").

violated a constitutional right. Thus, Officers Dickerson and Phillips are entitled to qualified immunity.

IV.    MOTIONS TO SEAL

Defendants have filed two motions to seal [Doc. #63, #75] seeking to seal limited portions of Defendants' Memorandum of Law in Support of their Motion for Summary Judgment and their Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment; portions of the Declarations of Lieutenant McClure and Officers Phillips and Dickerson; and Plaintiff's medical records, attached as Exhibits 2-4 to their Memorandum of Law in Support of Summary Judgment. The public right of access to judicial records is based in both common law and the First Amendment. See Rushford v. New Yorker Mag., Inc., 846 F.3d 249, 253 (4th Cir. 1988). With respect to the documents and information at issue in the present case, the Fourth Circuit has "squarely held that the First Amendment right of access attaches to materials filed in connection with a summary judgment motion." Doe v. Pub. Citizen, 749 F.3d 246, 267 (4th Cir. 2014) (citing Rushford, 846 F.2d at 252-53). When the First Amendment is implicated, the court may grant a motion to seal only upon a showing of a compelling interest, and only if the sealing is narrowly tailored to serve that interest. See Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004). "A district court must … weigh the appropriate competing interests under the following procedure: it must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." Id. at 576; see also Gonzalez v. Cuccinelli, 985 F.3d 357, 376 (4th Cir.

2021) ("To seal a document, the district court must (1) give the public adequate notice of a request to seal and a reasonable opportunity to challenge it, (2) consider less drastic alternatives to sealing, and (3) if it decides to seal, state the reasons, supported by specific findings, behind its decision and the reasons for rejecting alternatives to sealing.").

Defendants seek to file under seal Plaintiff's unredacted medical records in support of their Motion for Summary Judgment, as well as limited portions of their Memorandum of Law in Support of Summary Judgment, their Reply Memorandum of Law in Support of Summary Judgment, and portions of several declarations, all of which contain Plaintiff's medical information. The medical records include Plaintiff's treatment and provider notes while incarcerated at ACDC and during a period of safekeeping in Raleigh, and the portions of Defendants' briefs and declarations includes reference to one of Plaintiff's medical conditions. Here, Defendants' Motions to Seal were publicly docketed on November 14, 2024 and December 27, 2024. Interested parties have therefore had a reasonable amount of time to contest the sealing of the information at issue, although no party has done so. Accordingly, the notice requirement has been met. The proposed sealed exhibits contain Plaintiff's "confidential sensitive and personal medical information, the protection of which serves an important governmental interest." Fulp v. Columbiana Hi Tech, LLC, No. 1:16CV1169, 2018 WL 1027159, at *10 (M.D.N.C. Feb. 21, 2018). Finally, the sealing that Defendant seeks is narrowly tailored. Nearly all of Exhibits 2 through 4 contain sensitive information, such that less drastic alternatives are not feasible. In addition, Defendants' redactions to their briefs and declarations are very minor, and limited only to information about Plaintiff's medical condition. To the extent the information was relevant to the Court's decision, it is included

23

in this Order and Recommendation, which is public. Balancing the compelling interest to protect Plaintiff's private medical information with the First Amendment right of access, the Court will grant the motion to seal as it is narrowly tailored, and there is sufficient public information to explain the Court's reasoning.

## V.    REMAINING MOTIONS

Pending before the Court are also two Motions to Strike by Defendants seeking to strike Plaintiff's expert witnesses [Doc. #59] and Plaintiff's Motion entitled "Plaintiff's Motion of Summary judgment and in Lieu of filing of Defendant's Motion to Strike Plaintiff's Expert Answer to Defendant's Motion for Summary Judgment" [Doc. #79]. With respect to Defendants' motion to strike Plaintiff's experts, in light of the Court's recommendation that Plaintiff's claims be dismissed, Defendants' Motion to strike Plaintiff's experts is moot. In addition, because the Court has construed Plaintiff's motion entitled "Plaintiff's Motion of Summary judgment and in Lieu of filing of Defendant's Motion to Strike Plaintiff's Expert Answer to Defendant's Motion for Summary Judgment" as a response to Defendants' Motion for Summary Judgment, not Plaintiff's own motion for summary judgment, the Court denies Defendants' Motion to Strike Plaintiff's filing. To the extent Defendants seek attorney's fees under Rule 37 in connection with filing these motions, considering plaintiff's *pro se* status, the Court declines to award attorney's fees in this instance.

Finally, Plaintiff has filed a motion entitled "Motion of 2nd Response to Reply Memorandum of Law in Supporting of Motion Summary Judgment" [Doc. #84]. As noted above, the Court construes this motion as a sur-reply to Defendants' Motion for Summary

24

Judgment and has considered it, but to the extent that it is docketed as a separate motion, the motion may be terminated on the docket.

## VI.     CONCLUSION

IT IS THEREFORE RECOMMENDED that Defendants' Motion for Summary Judgment [Doc. #61] be GRANTED, and that all claims in this case be dismissed.

IT IS ORDERED that the Motions to Seal by Defendants [Doc. #63, #75] are GRANTED.

IT IS FURTHER ORDERED that the Motions to Strike by Defendants [Doc. #59, #79] are DENIED as moot.

IT IS FURTHER ORDERED that Plaintiff's "Motion of 2nd Response to Reply Memorandum of Law in Supporting of Motion Summary Judgment" [Doc. #84] is construed as a Sur-Reply to Defendants' Motion for Summary Judgment, and can be terminated on the docket.

This, the 11th day of August, 2025.

Joi Elizabeth Peake
United States Magistrate Judge